## SCHICK *v.* UNITED STATES.
## BROADWELL *v.* UNITED STATES.

ERROR TO THE DISTRICT COURT OF THE UNITED STATES FOR
THE NORTHERN DISTRICT OF ILLINOIS.

Nos. 222, 223.   Argued December 2, 1903.—Decided May 31, 1904.

A written waiver of a jury by a defendant in an action brought by the
United States to recover a penalty of fifty dollars under § 11 of the act
of 1886 as amended by the act of May 9, 1902, is not in conflict with the
laws and constitution of the United States, and does not invalidate the
judgment.

*McCray* v. *United States, ante,* p. 27, followed as to constitutionality of the
oleomargarine legislation.

THE facts are stated in the opinion of the court.

*Mr. Willim D. Guthrie* and *Mr. Miller Outcalt,* with whom
*Mr. Charles E. Prior, Mr. Francis J. Kearful, Mr. Delavan
B. Cole* and *Mr. Charles C. Carnahan* were on the brief for
plaintiff in error.[1]

*Mr. Solicitor General Hoyt* for the United States:

The proceedings are by way of criminal information to impose
the penalty provided for violation of section 11, of the oleo-
margarine act.   They are directed against the persons and do
not seek to forfeit their property.   They are, therefore, not
penal actions but criminal prosecutions.

"Civil proceedings" would seem to include only those in
which the object sought is the forfeiture of property, or the
recovery of a judgment for the amount of the prescribed
penalty.   16 Ency. Pl. & Pr. p. 231; *Atcheson* v. *Everett,* 1
Cowp. 382; *Clifton* v. *United States,* 4 How. 242; *Henderson's
Distilled Spirits,* 14 Wall. 33; *Snyder* v. *United States,* 112
U. S. 216; *Ex parte Wilson,* 114 U. S. 417.

---

[1] These cases were argued simultaneously with *McCray* v. *United States,* and
for abstract of arguments as to constitutionality and construction of the
statutes, see *ante,* p. 30.

The knowingly purchasing or receiving for sale of oleo-margarine not stamped according to law is specifically denominated an "offense," the penalty for which is $50. This being a petty offense, why may not a defendant waive his right to a trial by jury? *Callan* v. *Wilson*, 127 U. S. 552; *Brewater* v. *People*, 183 Illinois, 143. Upon this point the decisions are not uniform. *United States* v. *Shaw*, 59 Fed. Rep. 110, distinctly asserts such a right. Also *Bank of Columbia* v. *Okely*, 4 Wheat. 244. As bearing upon the subject, see *United States* v. *Anthony*, 11 Blatch. 200; *United States* v. *Taylor*, 11 Fed. Rep. 470; *In re Belt*, 159 U. S. 95; *Hallinger* v. *Davis*, 146 U. S. 318; *Thompson* v. *Utah*, 170 U. S. 353.

While the language of Art. 3 of the Constitution is that the trial of all crimes shall be by jury, the language of the Sixth Amendment is that the accused shall enjoy the right to a trial by jury; and similar language is used in the Seventh Amendment. If a trial by jury be imperative, then it cannot be waived, even though a statute authorizes such a waiver; for a statute cannot nullify a constitutional requirement. But it is the right to such a trial that is preserved by these Amendments. And if it be only the right, why may not the accused waive that right, even in the absence of a statute authorizing him to do so, especially in a petty case, where jury trial was not provided for under the common law?

Express written waiver of such right was filed in each of these cases. If that right did not exist, is not a trial by the court, after such an attempted waiver, at most only error? And, not having been assigned as error below, or in this court, how can it be noticed here? *Maxwell* v. *Stewart*, 21 Wall. 71; 22 Wall. 77; *Humphreys* v. *District of Columbia*, 174 U. S. 195.

MR. JUSTICE BREWER delivered the opinion of the court.

The constitutionality of the oleomargarine legislation hav-

ing been settled in *McCray* v. *United States,* just decided, there is in these two cases only a single question. The plaintiffs in error were severally prosecuted by information in the District Court of the United States for the Northern District of Illinois, under section 11 of the act of August 2, 1886, 24 Stat. 209, which reads: "That every person who knowingly purchases or receives for sale any oleomargarine which has not been branded or stamped according to law shall be liable to a penalty of fifty dollars for each such offense."

In each case the parties in writing waived a jury and agreed to submit the issues to the court. Judgments were entered in favor of the United States and their collection ordered by only the civil process of execution. That the defendants had failed to comply with the section was proved. Indeed, it was not seriously disputed, the defence resting only on the alleged unconstitutionality of the act. The waiver of a jury was not assigned as error, nor referred to by counsel at the hearing before us, either in brief or argument. The question of its effect upon the judgment was suggested by this court, and briefs were called for from the respective parties. Such briefs have been filed, and both agree that the waiver of a jury did not invalidate the proceedings. Notwithstanding this, the fact of the waiver appears in the record.

We entertain no doubt that the parties could rightfully make such a waiver, and that the judgments are in no way invalidated thereby. It will be noticed that the section characterizes the act prohibited as an offense, and subjects the party to a penalty of fifty dollars. So small a penalty for violating a revenue statute indicates only a petty offense. It is not one necessarily involving any moral delinquency. The violation may have been the result of ignorance or thoughtlessness, and must be classed with such illegal acts as acting as an auctioneer or peddler without a license, or making a deed without affixing the proper stamp. That by other sections of this statute more serious offenses are described and more grave punishments provided does not lift this one to the

dignity of a crime. Not infrequently a single statute in its several sections provides for offenses of different grades, subject to different punishments, and to prosecution in different ways. In some States in the same act are gathered all the various offenses against the person, ranging from simple assault to murder, and imposing punishments from a mere fine to death. This very statute furnishes an illustration. By one clause the knowingly selling of adulterated butter in any other than the prescribed form subjects the party convicted thereof to a fine of not more than one thousand dollars and imprisonment for not more than two years. An officer of customs violating certain provisions of the act is declared guilty of a misdemeanor and subject to a fine of not less than one thousand dollars nor more than five thousand dollars, and imprisonment for not less than six months nor more than three years. Obviously these violations of certain provisions of the statute must be classed among serious criminal offenses, and can be prosecuted only by indictment, while the violations of the statute in the cases before us were prosecuted by information. The truth is, the nature of the offense and the amount of punishment prescribed rather than its place in the statutes determine whether it is to be classed among serious or petty offenses, whether among crimes or misdemeanors. Clearly both indicate that this particular violation of the statute is only a petty offense.

In such a case there is no constitutional requirement of a jury. In the third clause of section 2, Article III, of the Constitution it is provided that "the trial of all crimes, except in cases of impeachment, shall be by jury;" and in Article VI of the amendments, that "in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury of the State and district wherein the crime shall have been committed." If there be any conflict between these two provisions the one found in the amendments must control, under the well-understood rule that the last expression of the will of the lawmaker prevails over an earlier

one. But that in the body of the Constitution does not include a petty offense like the present. It must be read in the light of the common law. "That," said Mr. Justice Bradley, in *Moore* v. *United States*, 91 U. S. 270, 274, referring to the common law, " is the system from which our judicial ideas and legal definitions are derived. The language of the Constitution and of many acts of Congress could not be understood without reference to the common law." Again in *Smith* v. *Alabama*, 124 U. S. 465, 478, is this declaration by Mr. Justice Matthews: ".The interpretation of the Constitution of the United States is necessarily influenced by the fact that its provisions are framed in the language of the English common law, and are to be read in the light of its history." In *United States* v. *Wong Kim Ark*, 169 U. S. 649, 654, Mr. Justice Gray used this language:

"In this, as in other respects, it must be interpreted in the light of the common law, the principles and history of which were familiarly known to the framers of the Constitution. *Minor* v. *Happersett*, 21 Wall. 162; *Ex parte Wilson*, 114 U. S. 417, 422; *Boyd* v. *United States*, 116 U. S. 616, 624, 625; *Smith* v. *Alabama*, 124 U. S. 465." See also *Kepner* v. *United States*, *post*, 100; 1 Kent, Com. 336.

Blackstone's Commentaries are accepted as the most satisfactory exposition of the common law of England. At the time of the adoption of the Federal Constitution it had been published about twenty years, and it has been said that more copies of the work had been sold in this country than in England, so that undoubtedly the framers of the Constitution were familiar with it. In this treatise, vol. 4, p. 5, is given a definition of the word " crimes: "

"A crime, or misdemeanor, is an act committed, or omitted, in violation of a public law either forbidding or commanding it. This general definition comprehends both crimes and misdemeanors; which, properly speaking, are mere synonymous terms; though in common usage the word ' crimes ' is made to denote such offenses as are of a deeper and more atrocious

dye; while smaller faults and omissions of less consequence are comprised under the gentler name of 'midemeanors' only."

In the light of this definition we can appreciate the action of the convention which framed the Constitution. In the draft of that instrument, as reported by the committee of five, the language was "the trial of all criminal offenses . . . shall be by jury," but by unanimous vote it was amended so as to read "the trial of all crimes." The significance of this change cannot be misunderstood. If the language had remained "criminal offenses," it might have been contended that it meant all offenses of a criminal nature, petty as well as serious, but when the change was made from "criminal offenses" to "crimes," and made in the light of the popular understanding of the meaning of the word "crimes," as stated by Blackstone, it is obvious that the intent was to exclude from the constitutional requirement of a jury the trial of petty criminal offenses. But we need not go beyond the express rulings of this court. In *Callan* v. *Wilson*, 127 U. S. 540, reference was made to many decisions of state courts, holding that the trial of petty offenses was not within any constitutional provision requiring a jury in the trial of crimes, and on page 557 it was said:

"Except in that class or grade of offenses called petty offenses, which, according to the common law, may be proceeded against summarily in any tribunal legally constituted for that purpose, the guarantee of an impartial jury to the accused in a criminal prosecution, conducted either in the name, or by or under the authority of, the United States, secures to him the right to enjoy that mode of trial from the first moment, and in whatever court, he is put on trial for the offense charged."

By section 563, Rev. Stat., the District Courts are given jurisdiction "of all crimes and offenses cognizable under the authority of the United States, committed within their respective districts, or upon the high seas, the punishment of which is not capital." There is no act of Congress requiring that

the trial of all offenses shall be by jury, and a court is fully organized and competent for the transaction of business without the presence of a jury. There is no public policy which forbids the waiver of a jury in the trial of petty offenses. On the contrary, by section 44 of the Code of Law for the District of Columbia, Congress provided, in respect to the Police Court, that—

"In all prosecutions within the jurisdiction of said court in which, according to the Constitution of the United States, the accused would be entitled to a jury trial, the trial shall be by jury, unless the accused shall in open court expressly waive such trial by jury and request to be tried by the judge, in which case the trial shall be by such judge, and the judgment and sentence shall have the same force and effect in all respects as if the same had been entered and pronounced upon the verdict of a jury. In all cases where the accused would not by force of the Constitution of the United States be entitled to a trial by jury, the trial shall be by the court without a jury, unless in such of said last named cases wherein the fine or penalty may be $50 or more, or imprisonment as punishment for the offense may be thirty days or more, the accused shall demand a trial by jury, in which case the trial shall be by jury."

And it is a well-known fact that in many Territories organized by act of Congress the legislature has authorized the prosecution of petty offenses in the police courts of cities without a jury.

But if there be no constitutional or statutory provision or public policy requiring a jury in the trial of petty offenses, upon what ground can it be contended that a defendant therein may not voluntarily waive a jury? Can it be that a defendant can plead guilty of the most serious, even a capital, offense, and thus dispense with all inquiry by a jury, and cannot when informed against for a petty offense waive a trial by jury? Article six of the amendments, as we have seen, gives the accused a right to a trial by jury. But the same article gives

him the further right " to be confronted with the witnesses against him . . . and to have the assistance of counsel." Is it possible that an accused cannot admit and be bound by the admission that a witness not present would testify to certain facts? Can it be that if he does not wish the assistance of counsel and waives it, the trial is invalid? It seems only necessary to ask these questions to answer them. When there is no constitutional or statutory mandate, and no public policy prohibiting, an accused may waive any privilege which he is given the right to enjoy. Authorities in the state courts are in harmony with this thought. In *Commonwealth* v. *Dailey*, 12 Cush. 80, the defendant in a misdemeanor case waived his right to a full panel and consented to be tried by eleven jurors, and this action was sustained by the Supreme Court of Massachusetts. Chief Justice Shaw, delivering the opinion of the court, said (p. 83): " He may waive any matter of form or substance, excepting only what may relate to the jurisdiction of the court." The same doctrine was laid down in *Murphy* v. *Commonwealth*, 1 Met. (Ky.) 365 ; *Tyra* v. *Commonwealth*, 2 Met. (Ky.) 1, and in *State* v. *Kaufman*, 51 Iowa, 578. In *Connelly* v. *State*, 60 Alabama, 89, a statute authorizing the waiver of a jury was sustained. The same rule was made in *State* v. *Worden*, 46 Connecticut, 349, which was a case of a felony. See also *People* v. *Rathbun*, 21 Wend. 509, 542.

We are of opinion that the waiver of a jury by the defendants in these cases and the consent to trial by the court was not in conflict with law, and the judgments are, therefore,

*Affirmed!*

The CHIEF JUSTICE, MR. JUSTICE BROWN and MR. JUSTICE PECKHAM, concur in the views expressed in this opinion, although they dissent from the judgments on the ground of their dissent in *McCray* v. *United States, ante,* p. 64.

MR. JUSTICE HARLAN, dissenting:

These are criminal prosecutions based on the act of Con-

gress of August 2, 1886, entitled "An act defining butter, also imposing a tax upon and regulating the manufacture, sale, importation and exportation of oleomargarine," supplemented by the act of October 1, 1890, and amended by the act of May 9, 1902. 24 Stat. 209, c. 840; 26 Stat. 567, 621, c. 1244, §41; 32 Stat. 193, c. 784.

The informations against Schick and Broadwell were substantially of the same character. Each charged that the defendant, a retail dealer in oleomargarine, unlawfully and knowingly purchased and received for sale certain oleomargarine which had not been stamped according to law.

The parties, in writing, waived a jury, and agreed to submit the issues to the court. The accused, in each case, pleaded not guilty. Evidence having been introduced, the defendant in each case moved the court to render a verdict and judgment of not guilty and that he be discharged, upon the ground that the above act of Congress, as amended, was in contravention of the Constitution of the United States in that it deprived the defendant and the oleomargarine manufacturers and dealers in the United States of their liberty and property without due process of law; was an unwarranted encroachment upon and interference with the police powers reserved to the several States and to the people of the United States ; invested an inferior executive officer with the power finally and arbitrarily to determine judicial questions concerning property rights; and so arbitrarily discriminated against oleomargarine in favor of butter as to be repugnant to the fundamental principles of equality and justice that were inherent in the Constitution.

In each case the motion was overruled, the defendant excepting. Motions for new trial and in arrest of judgment having been severally overruled, the court, *no jury having been empanelled*, found the defendant, in each case, guilty, and adjudged that he pay a fine of $50 and costs, and that execution issue therefor. From those judgments the present writs of error were prosecuted.

The assignments of error here present the same questions of constitutional law that were raised on the motion to render judgment for the defendant ; and, in addition, they question the action of the trial court in striking out and refusing to consider certain evidence.

Upon the face of the record the question arises whether the court below, without the aid of a jury, had jurisdiction to ascertain the facts, and, finding the defendants severally guilty of the offense charged, to impose upon each the fine prescribed by the statute.

I. That this is a criminal prosecution, and that the mode of procedure must be determined by the established rules governing the conduct of trials in criminal cases, is in my judgment not to be doubted. The record itself describes the information as a *criminal* information, and the case was tried as if it were a criminal prosecution. It never occurred to the trial court that it was a prosecution of any other kind. It is true that the act provides that all fines, penalties and forfeitures imposed by it may be recovered in any court of competent jurisdiction. § 19. But it is evident from the entire act that it makes all the violations of the provisions imposing a fine, or fine and imprisonment, or fine or imprisonment, criminal offenses to be punished in such mode as was appropriate or allowable by the law of criminal procedure. Throughout the act, when a fine is imposed, the doing of the thing forbidden is described as an "offense." If a person carries on the business of a manufacturer of oleomargarine, without having paid the special tax, he is subject, besides being liable to pay the special tax, to be fined not less than $1,000 and not more than $5,000; if he carries on the business of a whole-sale dealer in oleomargarine without having paid the special tax therefor he is subject, besides being liable for the special tax, to be fined not less than $500 nor more than $2,000; and if he carries on the business of a retail dealer in oleomargarine, without having paid the special tax, he may be fined not less than $50 nor more than $500 for each and every

*offense.* § 4.   Every person who knowingly sells or offers for sale, or delivers or offers to deliver, any oleomargarine in any other form than in new wooden or paper packages as described, or who packs in any package any oleomargarine in a manner contrary to law, or who falsely brands any package or affixes any stamp on any package denoting a less amount of tax than that required by law, "may be fined for each *offense* not more than $1,000, and be imprisoned not more than two years." § 6.   Every manufacturer of oleomargarine who neglects to affix the required label to a package containing oleomargarine made by him, or sold or offered for sale by or for him, and every person who removes any label so affixed may be "fined $50 for each package in respect to which such *offense* is committed."   § 7. Every officer of customs who permits imported oleomargarine "to pass out of his custody or control without compliance by the owner or importer thereof with the provisions of this section relating thereto, shall be guilty of a *misdemeanor* and shall be fined not less than $1,000 nor more than $5,000, and imprisoned not less than six months nor more than two years."   § 10.  Any person who wilfully neglects or refuses, when emptying a stamped package containing oleomargarine, to utterly destroy such stamps, "shall for each *offense* be fined not exceeding $50 and imprisoned not less than ten days nor more than six months.   And any person who fraudulently gives away or accepts from another, or who sells, buys, or uses for packing oleomargarine, any such stamped package, shall for each such *offense* be fined not exceeding $100 and be imprisoned not more than one year." § 13.  Any person who wilfully removes or defaces the stamps, marks or brands on packages containing oleomargarine taxed as provided, is guilty "of a *misdemeanor*, and shall be punished by a fine of not less than one hundred dollars, nor more than two thousand dollars, and by imprisonment for not less than thirty days nor more than six months."   § 15. Whenever any person engaged in carrying on the business of manufacturing oleomargarine who defrauds, or attempts to defraud,

the United States of the tax on the oleomargarine produced by him, or any part thereof, forfeits the factory and manufacturing apparatus used by him, and all oleomargarine and all raw material for the production of oleomargarine found in the factory and on the factory premises, and "shall be fined not less than five hundred dollars nor more than five thousand dollars, and be imprisoned not less than six months nor more than three years." § 17.

These sections are to be looked at in connection with section 11, on which this prosecution is based. That section provides "That every person who knowingly purchases or receives for sale any oleomargarine which has not been branded or stamped according to law, shall be liable to a penalty of fifty dollars for each such *offense*."

It is true that the word "penalty" is used in several sections of this act. But it is not to be conclusively inferred therefrom that the offense described was not a crime, within the strictest meaning of that word. Referring to the words "penalty," "liability," and "forfeiture," this court has said: "These words have been used by the great masters of Crown law and the elementary writers as synonymous with 'punishment,' in connection with crimes of the highest grade. Thus, Blackstone speaks of criminal law as that 'branch of jurisprudence which teaches of the nature, extent and degrees of every crime, and adjusts to it its adequate and necessary penalty.' Alluding to the importance of this department of legal science, he says : ' The enacting of penalties to which a whole nation shall be subject should be calmly and maturely considered.' Referring to the unwise policy of inflicting capital punishment for certain comparatively slight offenses, he speaks of them as ' these outrageous penalties,' and repeatedly refers to laws that inflict the ' penalty of death.'" *United States* v. *Reisinger*, 128 U. S. 398, 402. So, in *Huntington* v. *Attrill*, 146 U. S. 657, 667, after quoting the maxim of international law in *The Antelope*, 10 Wh. 66, 123, that "the courts of no country execute the penal laws of another," and observ-

ing that there was great danger, when interpreting that maxim, of being misled by the different shades of meaning allowed to the word "penal" in our language, this court said: "In the municipal law of England and America the words 'penal' and 'penalty' have been used in various senses. Strictly and primarily, they denote punishment, whether corporal or pecuniary, imposed and enforced by the State for a crime or offense against its laws. . . . Penal laws, strictly and properly, are those imposing punishment for an offense committed against the State, and which, by the English and American constitutions, the executive of the State has the power to pardon." Besides the act throughout uses the words "fine," and "fined" —words which, in their primary sense, import the punishment of a person convicted of crime.

I cannot doubt, after a scrutiny of the entire act, that every offense prescribed by it and for which a fine is imposed, was intended to be made and is a criminal offense—a crime against the United States—to be punished as such. Certainly the offenses prescribed in sections four, six, seven, ten, thirteen, fifteen and seventeen are crimes against the United States. If that be so, surely the offense prescribed in section 11 is a crime and not a mere penalty recoverable only by some form of proceeding of a civil nature. This view is substantially conceded by the Solicitor General when he says that "in view of the word 'offense' in section 11 of the oleomargarine act, there is ground for saying that the penalty which it provides was imposed as a fine for the violation of what is made a misdemeanor." If the United States could have proceeded in some form of civil action to recover the fine imposed by that section, it has not done so. It chose to proceed by criminal information, and the accused pleaded not guilty of the crime charged.

II. So far it has been my object only to show that the offense charged was a *crime* against the United States. I now inquire as to the mode in which it may be legally ascertained whether an accused, pleading *not guilty*, has committed the

crime charged against him.  Has the law designated any
particular tribunal or prescribed any special mode for trying
the issue of his guilt ?  The words of the Constitution upon
this subject are clear and explicit.  They leave no room for
interpretation.  Its express mandate is that " the *trial* of *all*
crimes, except in cases of impeachment, *shall be* by jury."
Const. Art. 3.  When the Constitution was placed before the
people for adoption or rejection many deemed those words,
explicit as they were, inadequate to secure all the benefits of
a jury trial as it existed at common law.

It is suggested that if any conflict exists between the ab-
solute requirement in the original Constitution, (Art. 3, § 2,)
that the " trial of all crimes, except in cases of impeachment,
*shall* be by jury," and the provision in the Sixth Amendment,
that the accused, in every criminal prosecution, " shall *enjoy
the right* to a speedy and public trial, by an impartial jury,"
etc., the latter, having been last adopted, must control.
But there is no such conflict.  Those who opposed the ac-
ceptance of the Constitution said, among other things, that
the words of that instrument, strictly construed, (Art. 3,
§ 2,) admitted of a secret trial, or of one that might be indefi-
nitely postponed to suit the purposes of the Government, or
of one taking place in a State or district other than that in
which the crime was committed.  The framers of the Consti-
tution disclaimed any such evil purposes; but in order to meet
the objections of its opponents, and to remove all possible
ground of uneasiness on the subject, the Sixth Amendment
was adopted, in which the essential features of the trial re-
quired by section 2 of Article 3 are set forth.  In other words,
the trial required by that section is the trial referred to in
the Sixth Amendment.  And the jury referred to in both the
original Constitution and in the Amendments was, the au-
thorities all agree, the historical jury of the common law,
consisting of twelve persons. no more and no less, whose unan-
imous verdict was necessary to conviction.  *Thompson* v.
*Utah,* 170 U. S. 343, 349; 2 Hale's P. C. 161; 1 Chitty's Cr.

Law, 505; 2 Blackstone, 719; Coke, Elizabeth, 654. Mr. Justice Story said: "The Constitution of the United States has exhibited great solicitude on the subject of the trial of crimes, and has declared that the trial of all crimes, except in cases of impeachment, shall be by jury; and has in some cases prescribed and in others required Congress to prescribe, the place of trial. And certain amendments of the Constitution, in the nature of a bill of rights, have been adopted, which fortify and guard this inestimable right of trial by jury." *United States* v. *Gibert,* 2 Sumner, 19, 38. See also *Capital Traction Co.* v. *Hof,* 174 U. S. 1; *Natal* v. *Louisiana,* 139 U. S. 621, 624; 4 Black. Com. 280; 1 Stephens' History of the Criminal Law, 123.

The contention in the present prosecutions is that although the positive constitutional injunction that the trial of all crimes shall be by jury furnishes an inflexible rule that may not be ignored in cases of felony, that rule, even where the accused pleads not guilty, may be disregarded altogether in a trial for a misdemeanor, provided he consents to be tried by the court without a jury. Plainly, such an exception is unauthorized by the Constitution if its words be interpreted according to their ordinary meaning. Nor, in my opinion, is it consistent with the fundamental rules of criminal procedure, as established and enforced at common law. In determining the meaning and scope of the words "due process of law," as used in the Constitution, the established rule is that "we must examine the Constitution itself, to see whether this process be in conflict with any of its provisions. If not found to be so, we must look to those settled usages and modes of proceeding existing in the common and statute law of England, before the emigration of our ancestors, and which are shown not to have been unsuited to their civil and political condition by having been acted on by them after the settlement of this country." *Murray's Lessee* v. *Hoboken Land Co.,* 18 How. 272, 277. So, in ascertaining whether under any circumstances a criminal case may be *tried* in a Federal court

without a jury—*the accused pleading not guilty*—we must inquire whether the Constitution forbids such an exercise of authority by the court, without a jury. If it does, that is the end of the matter; if it does not, then, and then only, may we look to such usages and modes of proceeding as existed at the common law for the trial of crimes before the adoption of the Constitution.

Proceeding on that basis, we have seen that the Constitution expressly requires that the trial of all crimes, except impeachment, shall be by jury; and I assert, with confidence, that no precedent can be found at common law for the trial by the court, without a jury, of any crimes except those described in adjudged cases and by elementary authorities as minor or petty offenses involved in the internal police of the State, and those could be tried summarily by some court or officer without the intervention of a jury *only* when thereunto authorized by an act of Parliament. Except in cases of contempt, the common law, Blackstone says, was a stranger to the summary proceedings authorized by acts of Parliament. Bk. 4, c. 20, 280. I am not aware of, nor has there been cited, any case in England in which, after *Magna Charta* and prior to the adoption of our Constitution, a court, tribunal, officer, or commissioner has, without a jury, even in the case of a petty offense, determined the question of crime or no crime, when the defendant pleaded not guilty; *unless the authority to do so was expressly conferred by an act of Parliament.* The exceptions to the rule at common law that all crimes must be tried by a jury were in the mind of this court when in *Callan* v. *Wilson*, 127 U. S. 540, 557, it said: "Except in that class or grade of offenses, called petty offenses, which, according to the common law, may be proceeded against summarily in any tribunal *legally constituted for that purpose,* the guarantee of an impartial jury to the accused in a criminal prosecution, conducted either in the name, or by or under the authority of, the United States, secures to him the right to enjoy that mode of trial from the first moment, and in what-

ever court, he is put on trial for the offense charged. In such cases a judgment of conviction, not based upon a verdict of guilty by a jury, is void."

If, in analogy to the powers exercised by the Parliament of England prior to the adoption of our Constitution, it should be held that Congress could treat the particular crime here in question as a petty offense triable by the court, without a jury, or with a jury of less than twelve persons, it is sufficient to say that Congress has not legislated to that effect in respect of the offense charged against these defendants, or of any other offense defined in the acts relating to oleomargarine. If it has the power to do so, Congress has not assumed, directly or indirectly, to withdraw such offenses from the operation of the constitutional provision that the trial of all crimes, except in cases of impeachment, *shall* be by jury. And the question is whether in the face of that explicit provision, and in the absence of any statute authorizing it to be done, the court, a jury being waived, had *jurisdiction* to try the accused for the crime charged.

In this connection we are confronted with the broad statement, found in some adjudged cases as well as in elementary treatises, to the effect that a person is entitled to waive *any* constitutional right, of whatever nature, that he possesses, and thereby preclude himself from invoking the authority of the Constitution for the protection or enforcement of that right. It is suggested that even when charged with murder he may plead guilty, and that the court thereupon without the intervention of a jury may pronounce such judgment as the law permits or authorizes. And it is confidently asked by those who make that suggestion, why may not one charged with a misdemeanor, and pleading not guilty, waive a jury altogether and consent to be tried by the court? This argument will not stand the test of reason. It proceeds upon the ground that jurisdiction to try a criminal case may be given by consent of the accused and the prosecutor. But such consent could have no legal efficacy. Undoubtedly one accused of

murder may plead guilty. But in doing so he renders a trial unnecessary. The Constitution does not prohibit an accused from pleading guilty. His right to do so was recognized long before the adoption of that instrument; and it was never supposed that such a plea impaired the force of the requirement that a trial for crime, under a plea of not guilty, shall be by jury. It is not to be assumed that the Constitution intended, when preserving the right of trial by jury, to change any essential rule of criminal practice established at the common law, before the adoption of that instrument. When the accused pleads guilty before a lawful tribunal he admits every material fact well averred in the indictment or information, and there is no issue to be tried; no facts are to be found; no trial occurs. After such a plea nothing remains to be done except that the court shall pronounce judgment upon the facts voluntarily confessed by the accused. What the Constitution requires is that the *trial* of a crime shall be by jury. If the accused pleads not guilty, there must, of necessity, be a trial; for by that plea he puts "himself on his country, which country the jury are;" he contests, by that plea, every fact necessary to establish his guilt; he is presumed to be innocent; nothing is confessed; and the facts necessary to show guilt must be judicially ascertained, in the mode prescribed by law, before any judgment can be rendered. But the vital inquiry is, in what way, when the defendant pleads not guilty, are the facts to be ascertained and the plea of not guilty overcome? Under the express words of the Constitution the answer must be: By trial before a jury of twelve persons organized to determine whether the charge of guilt be true; the function of the court being simply to conduct the trial and render a judgment in accordance with the verdict of the jury as to the facts. The court and the jury, not separately but *together*, constitute the appointed tribunal which alone, under the law, can *try* the question of crime, the commission of which by the accused is put in issue by a plea of not guilty.

There are some things so vital in their character that they

may not be legally done or legally omitted in a criminal prosecution, even with the consent of the accused. This is abundantly established by authority. The grounds upon which the decisions rest are, upon principle, applicable alike in cases of felonies and misdemeanors, although the consequences to the accused may be more evident as well as more serious in the former than in the latter cases. Certain it is, that felonies and misdemeanors are equally crimes within the meaning of the constitutional provision that the trial of all crimes shall be by jury, and there is no warrant to construe that provision as if it read, "the trial of all crimes, except in cases of impeachment *and in misdemeanors*, shall be by jury."

Let us look at some of the authorities in cases both of felonies and misdemeanors, and ascertain whether the consent, express or implied, of the accused can have the effect to dispense with the mode of trial appointed by law for criminal cases. As the question here presented has never been decided by this court, and is of importance, a somewhat extended reference to authorities is justified.

The first case to which I call attention is *Hopt* v. *Utah*, 110 U. S. 574, 579. That was a case of murder, arising in Utah while a Territory. It appeared that the trial, by triers appointed by the court, of challenges of proposed jurors was not had in the presence of the accused. It was there argued that his presence at the trial of such an issue was a privilege which he was entitled to waive, and that the entire proceedings against him should not fail because he chose not to exercise that privilege. This court, however, held that the trial of challenges could not legally take place except in the actual presence of the accused. In dealing with the suggestion that the right of the accused to be present before the triers was waived by his failure to object to their retirement from the court room, or to the trial of the several challenges in his absence, it was said: "We are of opinion that it was not within the power of the accused or his counsel to dispense with the statutory requirement as to his personal presence at the trial.

The argument to the contrary necessarily proceeds upon the ground that he alone is concerned as to the mode by which he may be deprived of his life or liberty, and that the chief object of the prosecution is to punish him for the crime charged. But this is a mistaken view as well of the relations which the accused holds to the public as of the end of human punishment. The natural life, says Blackstone, ' cannot legally be disposed of or destroyed by any individual, neither by the person himself, nor by any other of his fellow creatures, merely upon their own authority.' 1 Bl. Com. 133. The public has an interest in his life and liberty. Neither can be lawfully taken except in the mode prescribed by law. *That which the law makes essential in proceedings involving the deprivation of life or liberty cannot be dispensed with or affected by the consent of the accused*, much less by his mere failure, when on trial and in custody, to object to unauthorized methods." 4 Bl. Com. 11.

In *Thompson* v. *Utah*, 170 U. S. 343, 353, which was a case of grand larceny charged to have been committed while Utah was a Territory, (the trial occurring after Utah became a State,) one of the questions was whether the trial by a jury composed of eight jurors, as authorized by the statutes of the State, was a legal trial for a crime committed when Utah was a Territory under the exclusive jurisdiction of the United States. It was contended that as the accused did not object, until after verdict, to a trial by a jury of eight persons, he should not be heard to say that the trial was in violation of his constitutional rights. This court overruled that contention, saying: " It is sufficient to say that it was not in the power of one accused of felony, *by consent expressly given* or by his silence, to authorize a jury of only eight persons to pass upon the question of his guilt. The law in force, when this crime was committed, did not permit *any* tribunal to deprive him of his liberty, except one constituted of *a court and a jury of twelve persons*." After referring to *Hopt* v. *Utah*, above cited, the court proceeded: " If one under trial for a felony

the punishment of which is confinement in a penitentiary could not legally consent that the trial proceed in his absence, still less could he assent to be deprived of his liberty by *a tribunal not authorized by law to determine his guilt.*"

"The infirmity," say Cooley, "in case of a trial by a jury of less than twelve, by consent, would be that the *tribunal would be one unknown to the law, created by mere voluntary act of the parties;* and it would be in effect an attempt to submit to a species of arbitration the question whether the accused has been guilty of an offense against the State." Const. Lim. 319.

A leading case is that of *Cancemi* v. *People*, 18 N. Y. 128, 137. Its doctrines have been widely accepted as based upon a sound interpretation of constitutional provisions relating to criminal prosecutions. The Court of Appeals of New York said: "These considerations make it apparent that the right of a defendant in a criminal prosecution to affect, by consent, the conduct of the case, should be much more limited than in civil actions. It should not be permitted to extend so far as to work radical changes in great and leading provisions as to the organization of the tribunals *or the mode of proceeding prescribed by the constitution and the laws.* Effect may justly and safely be given to such consent in many particulars; and the law does, in respect to various matters, regard and act upon it as valid. Objections to jurors may be waived; the court may be substituted for triers to dispose of challenges to jurors; secondary in place of primary evidence may be received; admissions of facts are allowed; and in similar particulars, as well as in relation to mere formal proceedings generally, consent will render valid, what without it would be erroneous. A plea of guilty to any indictment, whatever may be the grade of the crime, will be received and acted upon if it is made clearly to appear that the nature and effect of it are understood by the accused. In such a case the preliminary investigation of a grand jury, with the admission of the accusation in the indictment, is supposed

to be a sufficient safeguard to the public interests. *But when issue is joined upon an indictment, the trial must be by the tribunal and in the mode which the constitution and laws provide, without any essential change. The public officer prosecuting for the people has no authority to consent to such a change, nor has the defendant.* Applying the above reasoning to the present case, the conclusion necessarily follows that the consent of the plaintiff in error to the withdrawal of one juror, and that the remaining eleven might render a verdict, could not lawfully be recognized by the court, at the circuit, and was a nullity. If a deficiency of one juror might be waived, there appears to be no good reason why a deficiency of eleven might not be; and it is difficult to say why, upon the same principle, the entire panel might not be dispensed with, and the trial committed to the court alone. It would be a highly dangerous innovation, in reference to criminal cases, upon the ancient and invaluable institution of trial by jury, and the constitution and laws establishing and securing that mode of trial, for the court to allow of any number short of a full panel of twelve jurors, and we think it ought not to be tolerated."

Upon the general question whether the consent or silence of the defendant can excuse the failure of the court at the trial to enforce such essential rules as are here prescribed by law for the trial of criminal cases, the case of *Hill* v. *People,* 16 Michigan, 351, 356, 357, 358, is instructive. That was a case of murder. The defendant was found guilty, and after the trial it was discovered that one of the jurors was disqualified under the statutes of Michigan. But that fact was unknown to the accused and his counsel until after the rendition of the verdict. It was contended by the State that by neglecting to challenge that juror, the accused lost the right to avail himself of the objection; and was to be deemed to have thereby waived all objections to the juror or to a trial by eleven qualified jurors. It should be here observed that the Constitution of Michigan preserved the

right, in all criminal prosecutions, to " a speedy and public trial by an impartial jury, which may consist of less than twelve men in all courts not of record.'" Looking at the case as one in which the trial had been by eleven competent jurors only, the court considered the general question of waiver as applicable to criminal cases. Speaking by Judge Christiancy, and observing that under the state constitution there could be no reasonable doubt of the competency of parties in civil cases to waive such an objection, or to stipulate for a trial by a jury of less than twelve, the court said: " But a criminal prosecution, in which the people in their sovereign capacity prosecute for a crime against the laws of the whole society, and seek to subject the defendant to punishment, must, it seems to us, be considered as a proceeding *in invitum*, against the will of the defendant throughout, so far as relates to a question of this kind, or any question as to the legal constitution of the court or jury by which he is to be tried. It would be adding materially to the generally recognized force of the obligation of contracts to hold that a defendant charged with a crime might, without a trial, enter into a binding contract with the prosecuting attorney (representing the State) to go to the penitentiary for a certain number of years in satisfaction for the offense. And yet it would approximate such a position, to hold that he might be bound by contract providing for a trial before a court or jury unknown to the constitution or the laws, the result of which trial might be to place him in the same penitentiary. The true theory, we think, is that the people, in their political or sovereign capacity, *assume to provide by law the proper tribunals and modes of trial for offenses, without consulting the wishes of the defendant as such;* and upon them, therefore, devolves the responsibility, not only of enacting such laws, but of carrying them into effect, by furnishing the tribunals, the panels of jurors, and other safeguards for his trial, in accordance with the constitution, which secures his rights."

The court added some general observations which may well

be heeded by every one charged with the administration of the criminal laws. It said: "But independent of all theories, and as a practical question, we think there would be great danger in holding it competent for a defendant in a criminal case, by waiver or stipulation, to give authority which it could not otherwise possess, to a jury of less than twelve men, for his trial and conviction; or to deprive himself in any way of the safeguards which the constitution has provided him, in the unanimous agreement of twelve men qualified to serve as jurors by the general laws of the land. Let it once be settled that a defendant may thus waive this constitutional right, and no one can see the extent of the evils which might follow; but the whole judicial history of the past must admonish us that very serious evils should be apprehended, and that every step taken in that direction would tend to increase the danger. One act or neglect might be recognized as a waiver in one case, and another in another, until the constitutional safeguards might be substantially fritted away. The only safe course is to meet the danger *in limine*, and prevent the first step in the wrong direction. It is the duty of courts to see that the constitutional rights of a defendant in a criminal case shall not be violated, however negligent he may be in raising the objection. It is in such cases, emphatically, that consent should not be allowed to give jurisdiction."

In *State* v. *Carman*, 63 Iowa, 130, 131, which was the case of an assault with an attempt to commit murder, the Supreme Court of Iowa said: "In our Code of Civil Practice it is provided that 'issues of fact in an action in an ordinary proceeding must be tried by a jury, unless the same is waived.' § 2740. In our Code of Criminal Procedure there is no provision for the waiver of a jury. On the other hand, it is provided that 'an issue of fact must be tried by a jury of the county in which the indictment is found, unless a change of venue has been awarded.' § 4350. *We regard this provision as excluding the jurisdiction of the court, without a jury, to try such issue.* The question presented is not as to the waiver of

a mere statutory privilege, but an imperative provision based, as we view it, upon the soundest conception of public policy. Life and liberty are too sacred to be placed at the disposal of any one man, and always will be, so long as man is fallible. The innocent person, unduly influenced by his consciousness of innocence, and placing undue confidence in his evidence, would, when charged with crime, be the one most easily induced to waive his safeguards. There is no resemblance between such a case and that of a person pleading guilty. In the latter case there is no trial, but mere judgment upon the plea. If the language of the statute were less imperative than it is, the adjudications would support us in reaching the same conclusion."

In *State* v. *Mansfield*, 41 Missouri, 470, 476, which involved the question of the right of the accused in capital crimes and felonies to waive his right to a jury of twelve persons, after referring to *Cancemi* v. *People*, 18 N. Y. 128, the Supreme Court of Missouri, speaking by Judge Wagner, conceded that in cases of misdemeanor, *created by statute*, the *Legislature*, under the laws of that State, might provide for their prosecution in a summary way, without the formality of an indictment, and that the accused could waive a jury or agree on a certain number. But there was no such statute in Missouri, and the court, in respect of the general question of the waiver of a jury, said: "Another good and sufficient reason, it occurs to us, is, that the prisoner's consent cannot change the law. His right to be tried by a jury of twelve men is not a mere privilege; it is *a positive requirement of the law.* He can unquestionably waive many of his legal rights or privileges. He may agree to certain facts and dispense with formal proofs, he may consent to the introduction of evidence not strictly legal, or forbear to interpose challenges to the jurors; *but he has no power to consent to the creation of a new tribunal unknown to the law to try his offense.* The law in its wisdom has declared what shall be a legal jury in the trial of criminal cases; that it shall be composed of twelve; and *a defendant,*

*when he is upon trial, cannot be permitted to change the law, and substitute another and a different tribunal to pass upon his guilt or innocence.* The law as to criminal trials should be based upon fixed standards, and should be clear, definite and uniform, and absolute. If one juror can be withdrawn, there is no reason why six or eight may not be, and thus the accused through persuasion or other causes may have his life put in jeopardy, or be deprived of his liberty, through a body constituted in a manner unknown to the law. Aside from the illegality of such a procedure, public policy condemns it. The prisoner is not in a condition to exercise a free and independent choice without often creating prejudice against him."

In *Wilson* v. *State*, 16 Arkansas, 601, 608, which was a case of larceny, the Supreme Court of Arkansas said: "Hence there would seem to be no other mode for the trial of a criminal issue, than that by jury. The difficulty is not obviated by any *waiver* of this mode of trial, *because the Legislature has provided no other mode, in lieu of it, in such an event, as it has in civil cases. Nothing short of a confession of the facts, or the finding of them by the verdict of the jury, can regularly authorize the judgment of the court.* If the accused would not only waive his right to a trial by jury, but go further, and withdraw his plea, and then confess the facts charged against him in the indictment, the court would be authorized to render a judgment against him; but *so long as his plea of not guilty is in, there is no mode by which the court can dispose of it, although the accused may waive a trial by jury, with all its attendant privileges, and desire ever so much that the issue may be disposed of by a reference of it to the judge,* or any other referee or arbitrator, and the prosecuting attorney may desire the same, and act in concert with the accused; for the simple reason that the law makes no provision for any such referee or arbitrator in criminal cases. The only provision is for a confession of the facts, or a trial by jury to determine them."

A leading case upon the subject of trial by jury is that of

*Work* v. *State of Ohio*, 2 Ohio St. 296, 302, 305. That was an information charging the defendant with assault and battery. The trial took place under an act of the Ohio legislature which permitted a trial in such a case by a jury of six men, notwithstanding the Constitution of Ohio provided that the right of trial by jury should be inviolate. The defendant pleaded not guilty, but was found guilty and sentenced to pay a fine of $100 and costs. In discussing the history of trial by jury, the court, speaking by Judge Ranney, said: "In what does the privilege of this great bulwark of personal liberty consist? The constitution furnishes no answer, nor was it necessary that it should. If ages of uninterrupted use can give significance to language, the right of jury trial and the *habeas corpus* stand as representatives of ideas as certain and definite as any other in the whole range of legal learning. The institution of the jury, referred to in our constitution, and its benefits secured to every person accused of crime, is precisely the same in every substantial respect, as that recognized in the great charter, and its benefits secured to the freemen of England, and again and again acknowledged in fundamental compacts as the great safeguard of life, liberty, and property: The same, brought to this continent by our forefathers, and perseveringly claimed as their birthright, in every contest with arbitrary power, and finally, an invasion of its privileges prominently assigned as one of the causes which was to justify them in the eyes of mankind in waging the contest which resulted in independence. . . . We are of opinion it was this very tribunal, thus constituted, that those who framed and adopted the constitution of this State intended to perpetuate, and make the safeguard of innocence, by securing its benefits to every person accused of crime, in any of its courts. There is certainly nothing in our history which points to a different conclusion. For half a century before its adoption, similar provisions had been so considered and acted upon. Until the passage of this law, *no person had ever been convicted of crime, by less than the*

*concurring assent of twelve of his peers; and no law had ever attempted to authorize it to be done.* If the power exists to diminish the number of the jury, it may be applied to all cases, and it may be reduced to two as well as to six. *The same constitutional provision that secures the right in a charge involving the life of the accused, secures it also in every other criminal case.* It is no answer to say that this would not likely be done. If it had been deemed safe to leave it to the discretion of the General Assembly, no constitutional provision was needed; but, whether needed or not, it has been ordained by a power which both the General Assembly and this court are bound to obey." Again: "But, without pursuing these considerations further, our opinion is, that the essential and distinguishing features of the trial by jury as known at the common law, and generally, if not universally, adopted in this country, were intended to be preserved, and its benefits secured to the accused in all criminal cases, by the constitutional provision referred to. That it is beyond the power of the General Assembly to impair the right, or materially change its character; that the number of jurors cannot be diminished, or a verdict authorized short of a unanimous concurrence of all the jurors. It follows that the act under which this conviction was obtained, in so far as it provides for a jury of six only, and authorizes a conviction upon their finding, is unconstitutional and void."

In *United States* v. *Taylor,* 11 Fed. Rep. 470, which was a criminal prosecution by information for the offense of carrying on the business of a retail dealer in liquors without having paid the special taxes required by law, the main question was as to the authority of the court to direct a verdict of guilty under the evidence. It was held by Judge McCrary that no such power existed in the court. In the course of his opinion he said that the constitutional guaranty of a jury in a criminal case was a right that *could not be waived, and that such a trial before the court by the prisoner's consent was erroneous.* It appears from the report of that case that Mr.

Justice Miller was consulted by Judge McCrary and concurred in the latter's views.

Among the cases cited by Judge McCrary was *State* v. *Maine*, 27 Connecticut, 281, which was a criminal information for placing a nuisance in a highway. The defendant pleaded not guilty. The case, *by agreement of the parties*, was tried by the court, which found the facts, and reserved the questions of law arising thereon for the advice of the Supreme Court of Errors. The judges of the latter court unanimously held that, "*as no statute conferred on the superior court the power to try this or any other criminal charge, excepting through the intervention of a jury*, the court below could not legally try the case in the manner in which it had done, and would not be able to render a legal judgment on the facts, if the advice of this court was given upon them. They therefore refused to entertain the case."

In *Neales* v. *The State*, 10 Missouri, 498, which is an indictment for unlawfully carrying on the business of a dram-shop keeper without having a license therefor, it appears that the defendant pleaded not guilty, and *neither party requiring a jury*, the case was submitted to the court, who found him guilty and assessed a fine of $30 against him. The Supreme Court of Missouri, in which State there was a constitutional provision providing that the right of trial by jury should remain inviolate, said: "Another objection, equally fatal to the judgment, was the trial of the cause by the court, on the plea of not guilty. It has heretofore been virtually decided by this court, in two cases, that unless the defendant pleads guilty to the charge contained in the indictment, the court cannot try the issue and assess a fine against him. 6 Missouri, 457; 9 Missouri, 696. It is exclusively the province of a jury to *try the issue of not guilty*, and *the consent of the defendant for the court to try the same, cannot confer such power upon the court*."

A case directly in point is that of *State* v. *Stewart*, 89 N. Car. 563, 564. That was an indictment for an assault and battery.

The defendant pleaded not guilty. A jury trial was *waived,* the court found the facts and adjudged the accused guilty. The judgment was arrested and the State appealed. The Supreme Court of North Carolina said: " It is a fundamental principle of the common law, declared in ' *Magna Charta,*' and again in our Bill of Rights, that ' no person shall be convicted of any crime but by the unanimous verdict of a jury of good and lawful men in open court.' Art. I, § 13. The only exception to this is *where the Legislature may provide other means of trial for petty misdemeanors* with the right of appeal—Proviso in same section. *This is not one of the petty misdemeanors embraced in the proviso;* and if it was, *no such means of trial as that adopted in this case has been provided by the legislature. The court here has undertaken to serve in the double capacity of judge and jury, and try the defendant without a jury, which it had no authority to do, even with the consent of the prisoner.*"

Later, in *State* v. *Holt,* 90 N. Car. 749, 754—which was an indictment for cruelty to animals—the same court, after observing that it was the province and duty of the judiciary to watch over and protect the fundamental rights, in all matters that come before them, said: "There was not the remotest purpose in this case, we are sure, to infringe the right of trial by jury in a criminal action, but for convenience sake and to save time (because the facts were not disputed) the facts of the case were agreed upon by the State and the defendant, and submitted to the judge, instead of letting a jury hear the evidence, and render a verdict upon the issue, or find a special verdict. In our judgment, this was not only irregular, but wholly without the sanction of law. *There is no statute that authorizes such procedure,* and the constitution forbids it. ' No person shall be convicted of any crime but by the unanimous verdict of a jury of good and lawful men in open court.' No jury was empaneled to try the issue; there was no verdict of a jury; there was no conviction. The judgment of the court had nothing to warrant it, and there was nothing upon

which it could properly rest. *The defendant could not consent to a conviction by the court. It had no authority to try the issue of fact raised by the pleadings.* The defendant did not plead guilty; he did not enter the plea of *nolo contendere,* or submit; he pleaded *autrefois convict,* and a jury must try the issue raised by that plea. *State* v. *Stewart,* 89 N. Car. 563; *State* v. *Moss,* 2 Jones, 66; 1 Bish Cr. Pl. § 759, and cases there cited; *Cancemi* v. *People,* 18 N. Y. 128. *The legislature has not provided a means for the trial of cases like this, different from the ordinary method provided by law.* The court erred in passing upon the facts agreed upon and submitted to it without the finding of a jury, and for such error the judgment must be reversed and the court proceed to dispose of the case according to law."

Running through the adjudged cases is the thought that the facts necessary to be proved in order to sustain the charge of crime, where the plea is not guilty, must be ascertained in the mode ordained by law for such purpose. "When, therefore," says Blackstone, "a prisoner on his arraignment pleads not guilty, and for his trial hath put himself on his country, which country the jury are, the sheriff of the county must return a panel of jurors, *liberos et legales homines, de vicineto.*" Bk. 4, c. 27, *350. Now, all will agree that when the crime charged is a felony, a trial in a Circuit or District Court of the United States, even with the consent of the accused, without a jury composed of twelve persons, would be unauthorized and unavailing for any legal purpose. Why? Because, and only because, the law, the supreme law of the land, has declared that the trial of all crimes shall be by jury. And, perhaps, all will agree that the constitutional injunction applies with like force to such misdemeanors as by statute are punishable with imprisonment, and that a Circuit or District Court of the United States is without jurisdiction, under a plea of not guilty, no jury being impaneled, to try any crime against the United States involving *life* or *liberty.* The consent of the accused in such a case certainly cannot confer upon the court

authority to try the crime in a mode inconsistent with the one prescribed by the law.

In my judgment, the same principle must apply in the present case, although a fine only can be imposed. The case is embraced by the very words of the Constitution; for the offense charged is a crime—none the less a crime because only a fine is involved—and the constitutional mandate is that the trial of all crimes, except impeachment, shall be by jury. By what authority can a Federal court except from the operation of the constitutional mandate a crime punishable by fine? It is said that only the property of the accused can be affected, and, therefore, to his consent in this criminal case should be accorded the same effect as is given to his consent in a purely civil case to which he might be a party, and which involved no element of crime. In this view I cannot occur. Something more than property is involved in a criminal case, although the penalty imposed may be simply a fine. Whether the accused has violated the laws of his country, and whether he shall be branded by the judgment of a court as a criminal, are things of more consequence to the public than property the value of which is to be measured in money. What shall constitute a crime, how that crime shall be tried, and in what way the guilt of the accused shall be manifested, when he pleads not guilty, are exclusively for the Government to declare and regulate, and it is not for the accused, and the prosecutor, by the device of an agreement between them, to evade the requirements of the Constitution and provide a tribunal for the determination of the issue of crime or no crime different from that designated by the law. Crime or no crime, if the plea be not guilty, can be established in a court of the United States only by the verdict of a jury.

Undoubtedly, as already indicated, there were petty or minor crimes which, at common law, could be tried without a jury, and it may be assumed for the purposes of this case, that the constitutional provision that all crimes except im-

peachment shall be tried by jury is to be interpreted in the light of that fact. But, it may be repeated, that the trial, even of such cases, without a jury, was contrary to the genius of the common law, and was allowed by the courts *only in obedience to acts of Parliament,* which was not bound by a written constitution, and whose authority in matters of legislation was omnipotent, and, therefore, not to be disputed by an English court. An enumeration of all the crimes against the United States which may be reasonably declared to belong to the class known at the common law as petty offenses, punishable *under legislative sanction* without the intervention of a jury, need not here be attempted. Nor is it necessary to express any final judgment upon the question whether the particular crime here involved might, *by statute,* be placed in that class and tried without a jury. It is enough to say that even if Congress could place it in that class, and authorize its trial by summary proceedings, without a jury, or with a jury of less than twelve, it has not done so. The case, therefore, is controlled by the express constitutional injunction that all crimes, except in case of impeachment, shall *be* tried by a jury. The agreement of the accused and the prosecutor cannot confer jurisdiction, much less have the effect to displace the mode of trial established by the fundamental law and substitute for it one inconsistent with the principles of the common law as unmodified by any valid statute.

It is said that the nature of the offense and the amount of punishment prescribed must determine whether it is to be classed among serious or petty offenses. This, I take it, means that it is for the court, in the exercise of its inherent powers, to determine whether the offense is a serious one to be tried alone by a jury, or a petty one which may be tried without a jury. But the judiciary had no such function at common law. No court at common law assumed, without a jury, to try any offense, however trivial or petty, except under the authority of a statute conferring authority to that end. If the offense is punishable only by a fine of fifty dol-

lars—as is the case here—is it to be deemed a petty offense, and yet is one punishable by a fine of five hundred dollars to be deemed a serious one? Must there not be some fixed rule or limit on the subject? In my judgment, the Constitution establishes a rule which must be respected by every branch of the Government. Yet, under the principles now announced, an offense punishable by a fine of five or ten thousand dollars may be regarded—if the court so wills—as a petty offense, triable without a jury. I cannot understand where the judiciary derives its authority to prescribe any rule on the subject, in face of the absolute constitutional requirement that all crimes, except in cases of impeachment, shall be tried by a jury, and in face of the further significant fact, that no court at common law ever assumed to regard *any* crime, however trivial, as triable without a jury, except under express legislative sanction.

Again, it is said that in the original draft of the Constitution, the words were " the trial of all criminal offenses . . . . shall be by jury," and that these words were changed in the Convention so as to read " the trial of all crimes." Strangely enough, it is supposed that this change of words justifies the conclusion that the framers of the Constitution intended to dispense with a jury in such criminal offenses as the courts, uncontrolled by statute, deemed petty as contrasted with those that they deemed serious. To say that "crimes" means something different from "criminal offenses" is something that I cannot comprehend. A crime is a criminal offense and a criminal offense is a crime. But the contention of the prosecution, even if sound, does not answer the suggestion that, at common law, it was never the province of a court, by any inherent power it possessed, to prescribe what criminal offenses or crimes were triable, and what need not be tried, by jury. My point is that no criminal offense or crime against the United States can be tried except by jury, if the plea be not guilty, unless it be a petty offense or crime, *and* unless the legislative department declares that it may be so

tried. If the offense or crime be, in reality, in its essence, a petty one, then Congress may authorize it to be tried without a jury. But Congress has not so declared in respect of the offense or crime charged against the present defendant. The trial by jury is not one of form, but of the very substance of the mode prescribed for the trial of crimes. It may not be waived merely by the consent of the accused and the prosecutor. In the present case the court, as I think, entrenches upon the domain of the legislative department of the Government. It assumes, without authority, to prescribe a rule of criminal procedure which Congress has not, in its wisdom, undertaken to prescribe. It has made, not declared, law. There is no tendency, in these latter days, more dangerous than the assumption by one department of the Government of powers that belong to another department.

It is contended that this mode of trial, at least in misdemeanors involving only a fine, ought to be sanctioned—indeed, encouraged—as convenient both for the Government and the accused. What was said by Blackstone when referring to summary proceedings authorized by acts of Parliament in particular cases may well be repeated, at this day, whenever it is proposed, upon grounds of convenience, to dispense with juries in criminal prosecutions, and thereby introduce a new mode for the trial of crimes. He said: " And, however *convenient* these may appear at first (as doubtless all arbitrary powers, well executed, are the most *convenient*) yet let it be again remembered, that delays and little inconveniences in the forms of justice are the price that all free nations must pay for their liberty in more substantial matters; that these inroads upon this sacred bulwark of the nation are fundamentally opposite to the spirit of our Constitution; and that though begun in trifles, the precedent may gradually increase and spread, to the utter disuse of juries in questions of the most momentous concern." Bk. 4, c. 27, 350.

I insist that as the offense charged in each of these cases

was a crime against the United States; as the Constitution expressly declares, without qualification, that the trial of all crimes, except impeachment, shall be by jury; as Congress has not assumed to declare that this case and like ones may be tried without a jury, the parties assenting; and as 'the trial of these cases by the court alone, without a jury, has no other sanction than the consent of the accused and the District Attorney, the judgment in each case should be reversed, and each case remanded with directions to set aside the judgment, grant a new trial, and take such further proceedings as may be in conformity with law.